2004-NMCA-113

98 P.3d 1030

**Kimberly J. PAYNE, Plaintiff–Appellant/Cross–Appellee,**

v.

**Thomas HALL, M.D., and Curtis W. Boyd, M.D., a Professional Corporation, Defendants–Appellees/Cross–Appellants.**

**No. 22,383.**

Court of Appeals of New Mexico.

July 1, 2004.

Certiorari Granted, No. 28,832, Oct. 1, 2004.

Clay H. Paulos, Ian D. McKelvy, Sanders, Bruin, Coll & Worley, P.A., Roswell, NM, for Appellant.

Michelle U. Estrada, Michael W. Brennan, Madison, Harbour, Mroz & Brennan, P.A., Albuquerque, NM, for Appellees.

## OPINION

CASTILLO, Judge.

{1} In this case, we decide whether an alleged original tortfeasor may claim that the alleged successive tortfeasor was the sole proximate cause of a plaintiff's injury. Plain-

tiff Kimberly J. Payne sued Defendants Thomas Hall, M.D., (Dr. Hall) and the medical clinic Curtis W. Boyd, M.D., P.C., (clinic) for negligence in performing an abortion; she claimed that their negligence resulted in injuries enhanced by doctors at the University of New Mexico Hospital (hospital). The jury returned a special verdict of negligence but found that Defendants' negligence was not the proximate cause of Plaintiff's injuries. On appeal, Plaintiff raises five issues: (1) the district court erred in permitting evidence, testimony, and argument of comparative fault; (2) proximate cause should have been imposed as a matter of law once the jury found negligence; (3) the jury was improperly instructed that it could find that the injuries were solely the result of the hospital's negligence; (4) the testimony of one of Defendants' expert witnesses was cumulative and inadmissible; and (5) evidence of Plaintiff's alleged prior intravenous drug use was inadmissible. We affirm.

## I. BACKGROUND

{2} Plaintiff's physician referred her to the clinic for an abortion of her eighteen-week-old fetus. Because she was in the second trimester of pregnancy, the clinic scheduled a two-day abortion procedure known as a D & E, a dilation and extraction. On the first day of the procedure, Plaintiff filled out clinic forms, including medical history, and received counseling and an initial health check. She also spoke with Dr. Hall, an employee of the clinic, who would perform the abortion. There were no questions on the medical history form concerning prior intravenous (IV) drug use. The form did ask whether a patient was currently using street drugs; Plaintiff answered no. After the background procedures were completed, Dr. Hall began the dilation portion of the procedure. He inserted a dilator, called a laminaria, into Plaintiff's cervix. The purpose of the laminaria is to expand the cervical canal, which is part of the uterus, so that on the second day of the procedure, the physician can more easily access the uterus with instruments to extract the fetus. Plaintiff had difficulty relaxing and experienced a high level of discomfort with the first day's procedure; Dr. Hall actually stopped before inserting the laminaria and suggested to Plaintiff that if

she could not tolerate it, then it would not be advisable to continue. Plaintiff asked Dr. Hall to try again because she wanted the abortion. Dr. Hall did so, and the laminaria was fully inserted. Plaintiff returned to the clinic on December 11, 1997, so that Dr. Hall could perform the extraction, thus completing the abortion procedure.

{3} On the second day, neither the clinic staff nor Dr. Hall was able to start an IV in Plaintiff's arms; Dr. Hall testified that he saw scarring on Plaintiff's arms. Although at trial Plaintiff denied taking illegal drugs intravenously in her arms, Dr. Hall further testified that he questioned Plaintiff about the scarring and that she acknowledged having been an intravenous drug user. After determining that an IV would not be possible, clinic staff unsuccessfully attempted to obtain an anesthesiologist. Dr. Hall discussed with Plaintiff other alternatives to an IV. One option was to continue with the procedure in the clinic by using intramuscular (IM) anesthesia for pain control; another option was to find a doctor to perform the procedure in a hospital. Dr. Hall told Plaintiff of the difficulty of doing the procedure without IV access because of the possibility of bleeding. He also told her he would have to transfer her to the hospital if she had inordinate bleeding or if she was unable to tolerate the procedure without general anesthesia. Plaintiff opted to have the abortion at the clinic.

{4} After IM anesthesia was administered, Dr. Hall proceeded to remove the laminaria with Sopher forceps. At this point, Plaintiff apparently had a hard time staying still, was in a significant amount of distress, began experiencing a lot of pain, and was screaming and moving her legs and body off the table. Dr. Hall stopped the procedure and asked Plaintiff if she could tolerate continuing if given more pain medication. After Plaintiff indicated that she wanted to go on with the procedure, a nurse administered an additional dose of medication.

{5} Plaintiff testified that after the second dose of medication, the procedure was not quite as painful; but she said she still had pain, which toward the end "became extreme .... just like somebody had stabbed you."

At various times during the second day's procedure, Plaintiff requested that Dr. Hall stop. Although the parties dispute the extent of his compliance with her requests, Dr. Hall testified that he stopped each time and asked Plaintiff if she wanted to continue before he proceeded.

{6} After the second dose of medication took effect, Dr. Hall began the process of dilating the cervix and, when the cervix was large enough, inserted the Sopher forceps in an unsuccessful attempt to rupture the membranes. Following his attempt to rupture the membranes, he inserted a suction cannula to extract the fetus. The cannula, a plastic tube, is attached to a machine operating like a vacuum cleaner; the machine provides the suction for the extraction. Plaintiff again asked him to stop. At this point, Dr. Hall determined that he was unable to complete the procedure and contacted Shauna Jamison, M.D., (Dr. Jamison) at the hospital to determine if she would be willing to continue the abortion. She was willing, and Plaintiff was transported to the hospital. At trial, the parties disputed whether or not Dr. Hall perforated Plaintiff's uterus or whether any other unintended physical injuries occurred at the clinic and necessitated the transfer. According to Dr. Hall, Plaintiff's inability to tolerate the procedure caused the transfer. In his operative report, Dr. Hall wrote that Plaintiff was "having extreme pain with beginning extraction" and that he "strongly suspect[s] possible perforation." Plaintiff contends that the suspected perforation necessitated the transfer.

{7} Plaintiff arrived at the emergency room and was examined by Jackie Johnson–Maybach, M.D., (Dr. Maybach), a second-year gynecology resident. Dr. Maybach reported that Plaintiff appeared stable and had normal vital signs and no obvious evidence of a perforation. An hour and a half later, Plaintiff was taken to the operating room and placed under general anesthesia. Prior to taking Plaintiff to the operating room, Dr. Jamison contacted Dr. Hall to determine what had actually transpired during the procedure at the clinic. In response to her questions, Dr. Hall told Dr. Jamison that he had not ruptured the membrane and had not obtained any tissue or removed any fetal parts. There was a dispute as to Dr. Hall's response to the question of whether he had perforated the uterus. Dr. Jamison insists he said no; Dr. Hall insists he said, "I [don't] think so, but I could not be sure."

{8} Once Plaintiff was anesthetized, Dr. Maybach attempted to complete the abortion under the supervision of Dr. Jamison. Dr. Maybach placed Sopher forceps through Plaintiff's cervix and twice unsuccessfully tried to rupture the membranes. Dr. Jamison then took the forceps, went into the uterus, and pulled out a lower extremity of the fetus; she then let Dr. Maybach continue with the procedure. There was testimony that Dr. Maybach previously performed only two or three prior abortions, none of which was complicated. Dr. Jamison, aware of this fact, let Dr. Maybach proceed "because she wanted to do the procedure and I wanted to guide her and give her more experience in that." Dr. Jamison also testified that had she suspected Dr. Hall had perforated the uterus, she would not have permitted Dr. Maybach to "go into the uterus." Dr. Maybach went back into the uterus with the suction cannula; a whitish tissue passed through the tubing. The pathologist later determined that the tissue was Plaintiff's right ureter. The ureters are the tubes that drain the kidneys down to the bladder. Dr. Maybach next inserted the forceps to grasp tissue; when she took the forceps out, Plaintiff's right ovary was in them. At that point, the two doctors terminated the abortion procedure and prepared Plaintiff for abdominal surgery.

{9} Upon opening Plaintiff's abdomen, the doctors found that Plaintiff's uterus was perforated and that the fetus was partially into the abdominal cavity through the wall of the uterus; Dr. Jamison, with the assistance of Dr. Maybach, extracted the fetus and proceeded to do a hysterectomy. Dr. Jamison testified that the large perforation in the uterus required the hysterectomy. Following the removal of the uterus, Dr. Jamison looked for but was unable to locate the right ureter. Unaware that it had actually been removed earlier through the suction cannula, Dr. Jamison called urology for assistance to find it. As indicated above, it was eventually

found by the pathologist. As a result of the avulsed ureter, Plaintiff lost a kidney.

{10} After Plaintiff filed her complaint, Dr. Hall and the clinic (Defendants) filed a third-party complaint seeking indemnification from the hospital. The third-party claim was dismissed for failure to comply with the statutory period of limitations. Prior to trial, Plaintiff sought a determination from the trial court that the case involved successive tortfeasors, and she requested that the court preclude Defendants' evidence of the hospital's fault. The trial court instead waited until the close of evidence to rule that the case did present a successive tortfeasor scenario. At closing, the trial court did not allow Defendants to argue comparative fault but did permit argument that the hospital was the proximate cause of all of Plaintiff's injuries. The case was ultimately submitted to the jury; Plaintiff's instruction to the jury on the issue of negligence made the following five claims:

1. Curtis W. Boyd, M.D., P.C. was not an adequately equipped clinic for performing abortions of the type performed on Kim Payne.

2. Dr. Hall proceeded to attempt an abortion procedure on Kim Payne at the Boyd Clinic without an anesthesiologist when an anesthesiologist was needed.

3. Dr. Hall proceeded to attempt an abortion procedure on Kim Payne at the Boyd Clinic without having obtained IV access.

4. Dr. Hall continued with the abortion procedure after Kim Payne was screaming in pain and telling him to stop.

5. Dr. Hall failed to accurately relay Kim Payne's medical history and condition to UNM Hospital upon her transfer there.

The jury was also instructed that Plaintiff had the burden of proving that Defendants' negligence was the proximate cause of Plaintiff's injuries. In addition to the uniform proximate cause instruction, the jury was instructed with the following successive tortfeasor language:

When a person causes an injury to another which requires medical treatment, it is foreseeable that the treatment, whether provided properly or negligently, will cause additional harm. Therefore, the person causing the original injury is also liable for the additional injury caused by subsequent medical treatment, if any.

Also included in the negligence instruction was Dr. Hall's contention "that [Plaintiff's] injuries were caused by the acts or omissions of employees or agents of the [hospital]." The jury returned a special verdict, finding Defendants negligent but also finding that any negligence was not a proximate cause of Plaintiff's injuries or damages. Plaintiff then filed a motion for judgment notwithstanding the verdict (JNOV) on the issue of proximate cause or, alternatively, a new trial on all issues. The trial court denied the motion, and Plaintiff appealed to this Court. Defendants filed a cross-appeal on the trial court's successive tortfeasor ruling, which we ultimately dismissed as untimely. Additional facts will be included in our discussion as necessary.

{11} Because of the successive tortfeasor issues, this Court originally certified the case to our Supreme Court, which was addressing successive tortfeasor liability in *Lewis ex rel. Lewis v. Samson;* the Supreme Court granted but later quashed certification after issuing its opinion. *Lewis ex rel. Lewis v. Samson,* 2001–NMSC–035, 131 N.M. 317, 35 P.3d 972 (hereinafter *Lewis* ). We subsequently asked the parties to brief the implications of *Lewis* for this case.

## II. DISCUSSION

{12} Plaintiff raises five issues in her appeal. Three concern successive tortfeasor liability, and two relate solely to evidentiary issues. We address them in turn.

### A. Successive Tortfeasor Liability

{13} Plaintiff's successive tortfeasor liability issues are as follows. First, Plaintiff argues that once the jury found negligence by Defendants, the trial court should have imposed proximate cause by Defendants as a matter of law. Second, Plaintiff argues that the trial court erred in allowing evidence or argument on any comparative fault of the hospital, since Defendants were original tortfeasors and the hospital was the successive

386

tortfeasor. Relying on *Lewis,* Plaintiff argues that evidence of the successive tortfeasor's comparative fault is irrelevant where the original tortfeasor is sued. Third, Plaintiff points to jury instruction language containing Defendants' contentions that Plaintiff's injuries were caused by employees or agents of the hospital. Plaintiff contends this language wrongly injected issues of comparative fault and confused the jury.

### 1. Imposition of Proximate Cause as a Matter of Law

{14} Plaintiff argues that a jury finding of negligence required the trial court to impose proximate cause and that the trial court therefore erred in denying her motion for JNOV. Plaintiff contends that under *Lewis* and *Lujan v. Healthsouth Rehabilitation Corp.,* 120 N.M. 422, 902 P.2d 1025 (1995), an original tortfeasor's negligence is, as a matter of law, the sole proximate cause of the original and enhanced injury. First, we review de novo the legal question regarding the imposition of proximate cause. *Sowder v. Sowder,* 1999–NMCA–058, ¶ 7, 127 N.M. 114, 116, 977 P.2d 1034, 1036 ("We review questions of law de novo."). We then review the trial court's denial of the motion for substantial evidence. *Page & Wirtz Constr. Co. v. Solomon,* 110 N.M. 206, 209, 794 P.2d 349, 352 (1990).

{15} There is no doubt Plaintiff was injured at the hospital. The question is whether there was an original injury caused by Defendants before Plaintiff went to the hospital. Plaintiff reasons that Dr. Hall created an emergency situation that required Plaintiff to get subsequent treatment at the hospital. She further argues that her injuries at the hospital would not have occurred "but for" Defendants' negligence. She equates the need for additional medical treatment with "injury." We disagree with Plaintiff's reasoning and do not interpret *Lewis* and *Lujan* as abolishing a plaintiff's burden to prove that a defendant caused an original injury before a court may impose liability as a matter of law on that defendant for any enhanced injuries.

{16} In analyzing the imposition of proximate cause, we begin with the jury instructions. Jury instruction 4 informed the jury that Plaintiff had the burden of proving

that one or both Defendants failed to use the skill or care required of them in at least one of several claims alleged. The jury was also instructed that Plaintiff had the burden of proving "that such negligence was a proximate cause of the injuries and damages." In the special verdict, the jury answered yes to the question "Was any defendant negligent?" but did not find the negligence to be the proximate cause of Plaintiff's injuries and damages.

{17} Plaintiff argues that the finding of negligence required the trial court to impose proximate cause as a matter of law. We believe Plaintiff's contention is based on a confusion regarding the meaning of negligence. Negligence as a cause of action requires the proof of the following elements: duty, breach of that duty by failing to conform to the required standard, proximate cause, and loss or damage. *Lopez v. Maez,* 98 N.M. 625, 630, 651 P.2d 1269, 1274 (1982). Plaintiff had the burden of proving all of these elements as to Defendants in order for them to be considered an original tortfeasor. Frequently, however, the term "negligence" is applied to the second requirement alone. *Holland v. Lawless,* 95 N.M. 490, 495, 623 P.2d 1004, 1009 (Ct.App.1981) (stating that the term "negligence" is frequently applied to refer to the failure of an alleged tortfeasor to conform to the standard of conduct imposed in the case). In the context of the jury instruction, the term "negligence" does not refer to the cause of action, but rather to Defendants' failure to conform to the standard of care required of them. A simple failure to conform to a standard is not sufficient to establish the complete tort. *See Baer v. Regents of the Univ. of Cal.,* 1999–NMCA–005, ¶ 7, 126 N.M. 508, 972 P.2d 9 ("Under established principles of tort theory, negligence must proximately cause an injury for the defendant to be liable for the resulting damages."). Clearly, the jury determined that Defendants failed to conform to a standard, but the jury also determined that the failure was not the proximate cause of Plaintiff's injuries. *See Waild v. Boulos,* 2 A.D.3d 1284, 770 N.Y.S.2d 253, 255 (N.Y.App. Div.2003) (stating that a motion to set aside the verdict was properly denied where the jury found that the physician was negligent

but that such negligence was not a proximate cause of the plaintiff's injury and that some of the theories of negligence presented to the jury were not necessarily causally related to the patient's injuries). Essentially, the jury concluded that Plaintiff failed to prove the cause of action of negligence and that Defendants were therefore not the original tortfeasor. Without an original tortfeasor, there can be no successive liability.

■ {18} Plaintiff's argument that the trial court should have imposed proximate cause as a matter of law once the jury found negligence is undermined by Plaintiff's own requested jury instructions. In her requested jury instruction 2, Plaintiff included language informing the jury that it was her burden to prove proximate cause. In requested jury instruction 17, Plaintiff directed the jury that if it should decide in her favor "on the question of proximate cause," then the jury must fix the amount of damages. Finally, the special verdict form submitted by Plaintiff asked the jury to determine if the negligence of Defendants was a proximate cause of Plaintiff's injuries and damages. None of this language was modified by the trial court, and the directions to the jury regarding proximate cause were included in the final instructions. Jury instructions not objected to become the law of the case. *Gutierrez v. Albertsons, Inc.*, 113 N.M. 256, 259 n. 1, 824 P.2d 1058, 1061 n. 1 (Ct.App.1991). The jury determined that any negligence on the part of Defendants was not the proximate cause of Plaintiff's injuries. From the evidence at trial, the jury could have concluded that there was negligence in not obtaining the IV access, but that particular act of negligence did not cause or lead to, in any way, the injury suffered by Plaintiff. The purpose of the IV access was to control bleeding. Plaintiff, however, never experienced uncontrollable bleeding while in the clinic, and there was no evidence that Plaintiff was referred to the hospital because of uncontrollable bleeding. This view of the evidence would support the jury verdict. *See O'Neel v. USAA Ins. Co.*, 2002–NMCA–028 ¶ 7, 131 N.M. 630, 41 P.3d 356 (recognizing that an appellate court is to view evidence in the light most favorable to support the jury verdict, rather than speculate on a theory of the evidence under which the jury may have

reached its conclusions for the wrong reason).

{19} We also look to *Lujan* and *Lewis* because they provide general direction regarding issues of successive tort liability. In *Lujan*, our Supreme Court stated the basic public policy behind successive tortfeasor liability: When a person causes an injury to another that requires medical treatment, it is foreseeable that the treatment, whether provided properly or negligently, will cause additional harm. *Lujan*, 120 N.M. at 426, 902 P.2d at 1029. The Court went on to discuss that the liability for the original injury and any enhanced injury is premised on the "concept that the original tort is a proximate cause of the harm attributable to negligent treatment." *Id.*

{20} In *Lewis*, Griego stabbed Lewis, who was then taken to the local hospital, where he was treated by the defendants, emergency-room physicians. In that case, the plaintiff sued the defendants for enhanced injures allegedly caused by their negligence. Griego was clearly the original tortfeasor, and evidence of his fault was admissible. *Lewis*, 2001–NMSC–035, ¶¶ 30, 35, 131 N.M. 317, 35 P.3d 972. By special verdict, the jury found no negligence by the defendants in their treatment of Lewis. *Id.* ¶ 4. Plaintiffs appealed. In its opinion, our Supreme Court set forth an overview of New Mexico's successive tortfeasor liability:

In *Lujan*, we explained that, with respect to an action by the injured party against the original tortfeasor, the original tortfeasor is jointly and severally liable for the entire harm to the plaintiff, including the original injury and any foreseeable enhancement of the injury by medical negligence. *Id.* at 426–27, 902 P.2d at 1029–30. "When a person causes an injury to another which requires medical treatment, it is foreseeable that the treatment, whether provided properly or negligently, will cause additional harm." *Id.* at 426, 902 P.2d at 1029; *accord* Restatement (Second) of Torts § 457 (1965). In other words, the original tortfeasor will not be heard to complain of foreseeable medical negligence precipitated by the initial tortious injury in defense of his or her own

388

liability to the injured party. Accordingly, instead of treating the issue as a question of fact for the jury, as is typical of questions of proximate causation, *Calkins v. Cox Estates*, 110 N.M. 59, 61, 792 P.2d 36, 38 (1990), we impose as "a positive rule of decisional law" the requirement of joint and several liability upon the original tortfeasor for the original and enhanced injuries. *Herrero v. Atkinson*, 227 Cal.App.2d 69, 38 Cal.Rptr. 490, 493 (1964). Thus, an original tortfeasor's liability in the context of subsequent medical negligence operates as an exception to the general rule of several liability. *See* § 41–3A–1(C)(4) (providing that joint and several liability applies "to situations ... having a sound basis in public policy").

*Lewis*, 2001–NMSC–035, ¶ 33, 131 N.M. 317, 35 P.3d 972 (footnotes omitted).

{21} While we agree with Plaintiff that *Lewis* is the reverse of our case, the above-quoted language indicates that the conceptual framework of a successive tortfeasor scenario involves an original injury that is subsequently enhanced by further negligence. The requirement that there be an initial injury—as opposed to mere negligence—is expressly and implicitly stated throughout the *Lewis* opinion, including in the discussion of the burden of proof that a party has in seeking to impose liability (and proximate cause as a "positive rule of decisional law"), based on a successive tortfeasor theory. *Lewis*, 2001–NMSC–035, ¶ 34, 131 N.M. 317, 35 P.3d 972.

■ {22} Here, the question is whether an alleged original tortfeasor may argue that any negligence that may have occurred is not necessarily the proximate cause of the injuries suffered by Plaintiff. Plaintiff contends that once negligence is found, proximate cause must be imposed as a matter of law. It appears, however, that her argument is based on the assumption that Defendants were in fact the original tortfeasors, as that term is defined in *Lewis* and *Lujan*. We conclude that Plaintiff's mere allegation of injury is not enough to impose successive tortfeasor liability; she must prove that Defendants were the original tortfeasors, that they caused an original injury. Indeed, the bedrock principle of successive tortfeasor law is that "[d]amage may be conveniently

severable in point of time." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 52, at 352 (5th ed.1984); *see Lujan*, 120 N.M. at 425–26, 902 P.2d at 1028–29 ("[Defendants] are successive tortfeasors by reason of divisible and causally-distinct injuries."). Having concluded that Plaintiff retains the burden to prove Defendants caused an original injury, we next analyze the trial court's denial of Plaintiff's motion for JNOV.

■ {23} We will not disturb the trial court's denial of Plaintiff's Rule 1–050 NMRA 2004 motion for JNOV on the issue of proximate cause, unless the jury's verdict was unsupported by substantial evidence. *Page & Wirtz Constr. Co.*, 110 N.M. at 209, 794 P.2d at 352. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). We do not reweigh the evidence; we view it in the light most favorable to the prevailing party, disregarding any inferences and evidence to the contrary. *Id.; Montoya v. Torres*, 113 N.M. 105, 109, 823 P.2d 905, 909 (1991). In our review, "[t]he question is not whether substantial evidence would have supported an opposite result; it is whether such evidence supports the result reached." *Hernandez v. Mead Foods, Inc.*, 104 N.M. 67, 71, 716 P.2d 645, 649 (Ct.App.1986). Finally, absent clear and manifest abuse of the trial court's discretion, we will not reverse its denial of Plaintiff's Rule 1–059 NMRA 2004 motion for a new trial. *Rhein v. ADT Auto., Inc.*, 1996–NMSC–066, ¶ 18, 122 N.M. 646, 930 P.2d 783.

■ {24} The jury found that any negligence by Defendants was not a proximate cause of Plaintiff's injuries. We find substantial evidence for the jury's view that an independent injury did not occur prior to Plaintiff's leaving the clinic. There was defense expert testimony from Philip Dempsey Darney, M.D., (Dr. Darney) that Dr. Maybach "absolutely" did not have sufficient training to conduct the procedure; that Dr. Maybach created the perforation leading to the sequence of events resulting in the loss of Plaintiff's uterus and kidney; and that had this perforation occurred at the clinic, Plain-

tiff's blood loss would not have been as limited as it was. He testified that Plaintiff was not in an emergency situation when she was transferred to the hospital.

{25} Additional defense expert testimony from Ronald Deyhle, M.D., (Dr. Deyhle) revealed that the size of the perforation was four to five centimeters; a tennis ball is seven centimeters. He testified that such a large perforation would have quickly rendered Plaintiff unstable from blood loss, and her vital signs would not have been normal when she arrived at the emergency room. Plaintiff points out that the two defense witnesses, Dr. Darney and Dr. Deyhle, acknowledged that it was possible that Dr. Hall perforated Plaintiff's uterus. However, Dr. Darney insisted that the injuries to Plaintiff's ovary and ureter did not occur until she was under general anesthesia; Dr. Deyhle maintained that even if Dr. Hall had perforated Plaintiff's uterus, it was not the "very large hole" that the doctors found when they opened her abdomen at the hospital. Furthermore, as Defendants emphasize, the causal connection between negligence and an injury must be medically probable, not just a possibility. *See Alberts v. Schultz,* 1999–NMSC–015, ¶ 29, 126 N.M. 807, 975 P.2d 1279 (clarifying that a "plaintiff must introduce evidence that the injury more likely than not was proximately caused by the act of negligence"); *Baca v. Baca,* 81 N.M. 734, 740, 472 P.2d 997, 1003 (Ct.App.1970) ("Evidence which would support a mere possibility of recovery is not sufficient."). Testimony concerning a possible perforation at the clinic does not establish the necessary medical probability.

{26} There was also testimony that Dr. Hall terminated the procedure because he felt that Plaintiff was responding with too much pain and that she needed general anesthesia. Dr. Darney testified he had terminated an abortion procedure when he was unable to proceed without anesthesia on the second day of the procedure. Dr. Darney believed Dr. Hall was right to send Plaintiff to a place where she could get better pain relief, because a patient's moving around in pain can increase the risk of perforation.

{27} As we discussed previously, the jury could have determined that Dr. Hall was negligent in not obtaining IV access but also that the failure caused no injury. Considering the evidence in the light most favorable to Defendants and keeping in mind that we must decide whether there is evidence to support the result reached, not whether there is evidence to support the opposite result, we conclude that there is substantial evidence for the jury's finding that Defendants were not the proximate cause of an original injury. We will not disturb this finding on appeal.

## 2. Admission of Evidence of Comparative Fault

{28} Plaintiff argues that the trial court erred in allowing evidence, testimony, and argument that the hospital was the sole proximate cause of Plaintiff's injuries. She urges a de novo review of the trial court's application of *Lewis* in allowing the admission of this evidence. We have already decided that Plaintiff must prove Defendants caused an original injury before proximate cause can be imposed as a matter of law. Accordingly, we review the admission of evidence for abuse of discretion. *Coates v. Wal–Mart Stores, Inc.,* 1999–NMSC–013, ¶ 36, 127 N.M. 47, 976 P.2d 999.

{29} Plaintiff correctly states that successive tortfeasor liability places joint and several liability on the original tortfeasor for the original and foreseeable enhanced injuries. *See Lewis,* 2001–NMSC–035, ¶ 33, 131 N.M. 317, 35 P.3d 972. However, *Lewis* does not stand for the proposition that the alleged original tortfeasor may not argue that the alleged successive tortfeasor is wholly responsible for a plaintiff's injuries. Indeed, the argument that another tortfeasor was wholly responsible represents a basic proximate cause defense. *See id.* ¶ 35 (concluding that an alleged successive tortfeasor may present a defense that the original tortfeasor was the sole proximate cause of the plaintiff's injuries). As our Supreme Court emphasized, it is the plaintiff's burden to prove proximate cause; if a defendant successfully argues that the other alleged tortfeasor was the sole cause of the injuries, then the plaintiff failed to establish that the defendant's negligence proximately caused the injuries. *Id.* In this case, Defendants presented as

their defense the theory that doctors at the hospital were solely responsible for Plaintiff's injuries. The trial court did not abuse its discretion in admitting evidence of this defense.

### 3. Jury Instruction

{30} We now turn to the jury instruction issue. Whether jury instructions were properly given is a mixed question of law and fact and is reviewed de novo. *State v. Gardner*, 2003–NMCA–107, ¶ 19, 134 N.M. 294, 76 P.3d 47. Plaintiff argues that the jury was confused by the interjection of comparative fault principles in the jury instructions, specifically by inclusion of the following language in Dr. Hall's defense instruction on negligence: "Dr. Hall also contends that her injuries were caused by the acts or omissions of employees or agents of the [hospital] . . . ." We fail to see how this statement would cause confusion. When we read the instructions together, we find nothing directing the jury to compare fault or apportion it. The instruction cited by Plaintiff is not a comparative fault instruction but rather an instruction setting forth Defendant's defense. Nor do we locate an instruction that compels a finding of only one tortfeasor, as alleged by Plaintiff. To the contrary, the jury was specifically instructed that if a person causes an injury that requires medical treatment, then that original tortfeasor is liable for foreseeable additional injuries caused by that treatment. Furthermore, once the jury found Defendants did not proximately cause Plaintiff's injuries, any alleged interjection of comparative fault principles would be harmless. *See Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999–NMCA–070, ¶ 15, 127 N.M. 397, 981 P.2d 1215. Accordingly, we find Plaintiff's jury instruction argument without merit.

### B. Remaining Evidentiary Issues

#### 1. Expert Witness Testimony

{31} Plaintiff next claims that the testimony of Defendants' two expert witnesses, Dr. Darney and Dr. Deyhle, was cumulative and therefore inadmissible. Evidence may be excluded if its probative value is substantially outweighed by needless presentation of cumulative evidence. Rule 11–403 NMRA 2004. However, we will not reverse based on cumulative evidence in the absence of an abuse of discretion. *See Davila v. Bodelson*, 103 N.M. 243, 251, 704 P.2d 1119, 1127 (Ct.App.1985). A trial court abuses its discretion only if its ruling is clearly untenable or unjustified by reason. *State v. Rojo*, 1999–NMSC–001, ¶ 41, 126 N.M. 438, 971 P.2d 829. In this case, the trial court determined that it would allow the second expert witness, Dr. Deyhle, to testify on the local standard of care, which the first witness, Dr. Darney, did not fully address. Our review of Dr. Deyhle's testimony indicates that Plaintiff objected twice on cumulative grounds; both times, the objections were sustained. Plaintiff now complains that other portions of the testimony were cumulative and that this testimony "[exacerbated] the [trial court's] error of allowing evidence and argument of comparative fault." Plaintiff should have objected to other portions of Dr. Deyhle's testimony at trial. *See State v. Lopez*, 105 N.M. 538, 544, 734 P.2d 778, 784 (Ct.App.1986). Furthermore, as we discussed above, once the jury found no proximate cause for Plaintiff's injuries, it would not have reached issues of comparative fault. We cannot say that the trial court's allowing testimony from a second expert witness was either untenable or beyond logic; there was no abuse of discretion.

#### 2. Prior Drug Use

{32} Plaintiff claims that the district court erred in admitting evidence of her alleged prior drug use. We review the trial court's evidentiary ruling for an abuse of discretion. *Coates*, 1999–NMSC–013, ¶ 36, 127 N.M. 47, 976 P.2d 999. Here, at least two of Plaintiff's specific allegations of negligence involved Dr. Hall's inability to insert an IV and his failure to have an anesthesiologist available for the abortion procedure. The defense to these allegations was that the scarring on Plaintiff's arms made it impossible for Dr. Hall to access her veins in order to insert an IV, and it was not until the second day that Plaintiff belatedly disclosed her drug use. Expert testimony confirmed that IV drug use may damage the veins, limiting the possibility of IV access. Testimony also revealed that patients who have used IV drugs experience additional prob-

lems, such as intolerance to pain, high tolerance to the effects of pain medication, and an inability to judge correct dosages. Defendants argued that Plaintiff's pain ultimately caused her to be transferred to the hospital and that her sensitivity to pain was due to her prior drug use. Because Plaintiff's IV drug use was directly at issue in this case, the trial court did not abuse its discretion in admitting the evidence.

## III. CONCLUSION

{33} For the reasons discussed above, we affirm the trial court on all issues.

{34} **IT IS SO ORDERED.**

A. JOSEPH ALARID, Judge (specially concurring).

MICHAEL D. BUSTAMANTE, Judge (dissenting).

ALARID, Judge (specially concurring).

{35} I concur in the result reached by Judge Castillo. I do not join in her reasoning, because I believe this case can be explained without reliance on the concurrent-successive tortfeasor dichotomy endorsed by the Supreme Court in *Lujan* and *Lewis*.

{36} The classic successive tortfeasor scenario such as *Lujan* involves an initial tort, such as an accident caused by negligent driving, in which the plaintiff suffers injuries requiring medical treatment. While undergoing treatment necessitated by the initial tort, the plaintiff is subjected to medical malpractice. The traditional rule in such cases is that the original tortfeasor's breach of the duty of care is a proximate cause of the entire harm suffered by the plaintiff, including damages for injuries caused by the malpractice. *See* Restatement (Second) Torts § 457 cmt. c, illus. 1 (1965).

{37} The traditional rule is a rule about causation, not apportionment of damages.[1] It addresses the question of whether the medical treatment should be treated as an unforeseeable, superseding cause that cuts off the initial wrongdoer's liability. The theory of the traditional rule is that the wrong-

ful conduct of the original tortfeasor continues to operate as a proximate cause while the plaintiff is being treated by D2. The original wrongful conduct is a proximate cause of harm suffered while undergoing medical treatment provided by D2 because the plaintiff would not have been in a position to have been harmed by exposure to the malpractice of D2 if D1 had not been negligent in the first place. An original injury is relevant to proximate cause in such cases because it is the reason the plaintiff goes to the hospital.

{38} However, it is easy to conceive of cases where the plaintiff does not immediately suffer a physical injury as the result of D1's negligence, but D1's negligence nevertheless is the cause of the plaintiff's exposure to malpracticing D2. Consider the following hypothetical cases.

{39} In Hypothetical 1, D1 negligently causes a collision with P, who is driving a car with her infant in a car seat. The child is in fact unharmed by the collision, but P, not knowing for sure that the child is unharmed, takes the child to the emergency room for a physical examination just to be safe. After examining the child and determining that he is unharmed, hospital personnel negligently leave the child unattended on an examination table and the child rolls off the table onto the floor, suffering a fractured skull.

{40} In Hypothetical 2, D1, a radiologist, negligently advises P that she has a tumor when she in fact does not. P then goes to D2, a surgeon, who negligently performs the unnecessary surgery, resulting in serious complications.

{41} In each of these scenarios D1 is as much a proximate cause of P's exposure to D2 as in the classic *Lujan* scenario. It is not clear to me why, when P sues D1, P should be required to prove that D1 caused an injury separate and apart from the injury caused by the combined negligence of D1 and D2.

{42} In my view, when a plaintiff sues D1, rather than D2, *Lewis* simply is inapplicable. Indeed, the Supreme Court in *Lewis* ex-

---

1. Because the traditional rule was developed prior to the adoption of comparative fault and during the heyday of joint and several liability, the traditional rule had the coincidental effect of subjecting the original tortfeasor to joint and several liability for damages due to the subsequent medical malpractice.

pressly limited its holding to two scenarios: (1) where D1 seeks indemnity from D2, or (2) where the plaintiff seeks to hold D2 severally liable for the damages from an enhanced injury. *Lewis*, 2001–NMSC–035, ¶ 34, 131 N.M. 317, 35 P.3d 972. The present case does not involve either of these scenarios. To have demonstrated proximate cause, Plaintiff need only have shown that Dr. Hall or the Clinic breached the standard of care and that this particular act of negligence caused Plaintiff to seek further treatment at the University of New Mexico Hospital.

{43} In the present case, a reasonable jury could have found that it was a breach of the applicable standard of care for Dr. Hall to proceed without an IV because it was foreseeable that Plaintiff might experience bleeding requiring the administration of IV drugs to control bleeding. However, Plaintiff did not experience uncontrolled bleeding. Her transfer to the hospital was caused by her inability to tolerate pain, not by the necessity of administering IV drugs to control bleeding. Defendants presented expert testimony from which the jury could have found that Dr. Hall did not breach the standard of care in failing to anticipate the extent of Plaintiff's inability to tolerate the pain of the procedure or in proceeding without IV access for the purpose of administering anesthesia. In short, there is a view of the evidence by which a reasonable jury could have concluded that the act of Dr. Hall that breached the standard of care (failing to have an IV to control bleeding) did not cause Plaintiff's transfer to the hospital; and, that Dr. Hall's decision to transfer Plaintiff to the hospital, while certainly the cause of her transfer, was not the product of a breach of the standard of care. I therefore agree with Judge Castillo's conclusion that Plaintiff was not entitled to a directed verdict on the question of proximate cause.

{44} While the hospital's treatment resulted in appalling injuries to Plaintiff, it is not at all unusual for medical malpractice to result in such injuries. *E.g., Lopez v. Southwest Cmty. Health Servs.,* 114 N.M. 2, 6–7, 833 P.2d 1183, 1187–88 (Ct.App.1992) (observing that child suffered severe physical and mental disabilities as the result of premature delivery due to malpractice of hospital and physician). Under the facts of this case submitting the question of whether the hospital's conduct was an independent intervening cause would have injected a false issue for the jury's consideration. *Torres v. El Paso Elec. Co.,* 1999–NMSC–029, ¶ 22, 127 N.M. 729, 987 P.2d 386. The district court properly refused to instruct the jury on independent intervening cause.

{45} With the argument that the hospital's malpractice was an independent intervening cause out of the case, proximate cause in this case boiled down to whether Dr. Hall and the Clinic committed an act of negligence that caused Plaintiff to seek further care at the hospital and whether Plaintiff was injured in the course of that treatment. As I have explained earlier in my special concurrence, there is a view of the evidence that would have allowed a jury to find negligence, yet also find that that negligence was not the proximate cause of Plaintiff's injuries. However, I think it entirely possible that the jury never understood that it could find proximate cause merely by concluding that Dr. Hall committed an act of negligence that required Plaintiff to seek further medical care at the hospital during which Plaintiff was injured. The rule of *Lujan* is somewhat counter-intuitive and may even appear to be unfair when it is applied to a case where the plaintiff's injuries occur *after* the plaintiff arrives at the hospital and is no longer under the care of D1. Given the opportunity by sufficiently general instructions, and encouraged by the argument of defense counsel, reasonable jurors applying common sense and relying on their basic sense of fairness could easily conclude that the acts of the healthcare providers, not the original tortfeasor, are "the" cause of any additional injures inflicted on the plaintiff after the plaintiff has been placed in their care. It is therefore essential for a plaintiff who pursues a *Lujan* theory of causation to tender instructions that narrow the jury's inquiry into proximate cause.

{46} Because proximate cause in this case reduced to the questions of whether Dr. Hall committed an act of negligence that required Plaintiff to seek further treatment from the hospital and whether Plaintiff was injured in the course of that treatment, to find proximate cause the jury merely had to answer

"yes" to the questions "Did the negligence of Defendant require Plaintiff to seek further medical care from [the hospital]?" and "Was Plaintiff injured in the course of that treatment?" Unfortunately for Plaintiff, these relatively straightforward questions were not found anywhere in her requested jury instructions. The absence of instructions straightforwardly submitting Plaintiff's *Lujan* theory of causation to the jury could very well explain why the jury found Defendants negligent, while also finding that their negligence was not a proximate cause of Plaintiff's injuries.

{47} Admittedly, Plaintiff did request the following instruction based upon *Lujan*, 120 N.M. at 426, 902 P.2d at 1029:

When a person causes an injury to another which requires medical treatment, it is foreseeable that the treatment, whether provided properly or negligently, will cause additional harm. Therefore, the person causing the original injury is also liable for the additional injury caused by subsequent medical treatment, if any.

Although a lawyer might understand the significance of this paraphrase of *Lujan*, it is unlikely that it would have informed a panel of non-lawyer jurors that all Plaintiff needed to do to establish proximate cause was to show that the negligence of Dr. Hall or the clinic caused Plaintiff to undergo further treatment at the hospital in the course of which Plaintiff was injured.

{48} While some responsibility must be attributed to Plaintiff's counsel, who based Plaintiff's theory of her case upon *Lujan* and who drafted the jury instructions on proximate cause, I share Judge Bustamante's concerns about the state of the law in this area. The *Lujan-Lewis* line of authority has confused and complicated apportionment of damages based upon causation to the point where even able counsel are "hard-pressed to accurately decipher the law, much less translate it to reasonably understandable jury instructions." Our current system simply is not "capable of being understood and applied by courts and juries in a reasonably efficient manner." Restatement (Third) of Torts: Apportionment of Liability § 26 cmt. a (2000).

BUSTAMANTE, Judge (dissenting).

{49} I dissent. My specific rationale is my disagreement with the opinion's conclusion that a completed tort by D1 prior to exposure to medical care providers is necessary in order to impose liability after D2 injures a plaintiff such as we have here. Judge Alarid's special concurrence aptly demonstrates why a completed tort is not necessary.

{50} In addition, the opinion and the special concurrence endorse a very narrow view of the record in order to find a view of the evidence which supports the jury verdict. I agree that we normally interpret records in the light most favorable to the verdict. I question that approach here because of the difficulty with the instructions noted by the special concurrence and because it fails to account in any way for the other theories of negligence Plaintiff posited. Given the lack of special interrogatories, no one knows what negligence the jury found. Thus, we cannot really assess whether its finding of no damage is supported by substantial evidence.

{51} I am also motivated by frustration flowing from the unduly complicated and uncertain nature of the law in this area. This case was tried after our opinion in *Lewis v. Samson*, 1999–NMCA–145, 128 N.M. 269, 992 P.2d 282, but before the Supreme Court's opinion in the same case. Even with the Supreme Court opinion I think the parties would have been hard-pressed to accurately decipher the law, much less translate it to reasonably understandable jury instructions. Given these difficulties—which have occupied the attention of this panel for many hours—I would remand for a new trial in the hope that our attempt at elucidation has been fruitful.